IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DENNIS P. WALSH, Regional Director :
of the Fourth Region of the :
NATIONAL LABOR RELATIONS BOARD, :
for and on behalf of the :
NATIONAL LABOR RELATIONS BOARD  :
           :
    Petitioner,    :
  v.          : **3:19-CV-1079**
            : **(JUDGE MARIANI)**
**MOUNTAIN VIEW CARE AND** :
**REHABILITATION CENTER, LLC** :
           :
    Respondent.   :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is the Regional Director of the Fourth Region of the

National Labor Relations Board's Petition for Injunction under Section 10(j) of the National

Labor Relations Act, as Amended (Doc. 1). Petitioner seeks injunctive relief pursuant to

Section 10(j) of the National Labor Relations Act ("NLRA") pending final disposition of the

matters pending before the Board with respect to unfair labor practices alleging that

Mountain View Care and Rehabilitation Center, LLC (the Respondent herein), has engaged

in, and is engaging in, unfair labor practices in violation of Section 8(a)(1) and (3) of the

NLRA. Specifically, the Regional Director has charged the Respondent, as an employer

engaged in commerce within the meaning of Section 2(2), (6) and (7) of the NLRA, with

unlawfully interrogating an employee, Yolanda Ramos, about her union activities and the

union activities of other employees on March 4, 2019, and thereafter on that same date, suspending Yolanda Ramos and then discharging her on March 5, 2019.

A hearing before an Administrative Law Judge of the National Labor Relations Board is scheduled to begin on July 8, 2019. (Doc. 14-4).

The Regional Director's petition for injunctive relief requests that this Court, pursuant to Section 10(j) of the NLRA, direct the Respondent to appear before this Court and show cause why an injunction should not issue enjoining and restraining the Respondent and its officers and agents, pending final disposition of these matters pending before the Board from:

(a)     discharging, suspending, or otherwise discriminating against employees because they support or assist the Union or engage in protected concerted activity;

(b)     interrogating employees about their union membership, activities, and sympathies;

(c)     in any like or related manner, interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed to them in Section 7 of the NLRA.

(Doc. 1, at 6-7). The Petition further requests that the Court enter an Order directing the Respondent, its officers, representatives, agents, servants, employees, attorneys, successors, and assigns and "all persons acting in concert or participation with it or them" to do the following pending final disposition of the matters pending before the NLRB:

(a)     Within 5 days, on an interim basis, rescind the suspension issued to Yolanda
        Ramos and not rely on that suspension when issuing any future discipline;

(b)     Within 5 days, on an interim basis, offer Yolanda Ramos immediate
        reinstatement to her previous position or, if that position no longer exists, to a
        substantially equivalent position, without prejudice to her seniority or any
        other rights and privileges she previously enjoyed, displacing, if necessary
        any employees hired to replace her;

(c)     Within 10 days of the Court's Order, to hold a mandatory employee meeting
        or meetings, on working time and scheduled to ensure the widest possible
        employee attendance, at which the District Court's Order will be read to
        employees by a responsible Respondent official in the presence of a Board
        agent or, at the Respondent's option, have a Board agent read the Order in
        the presence of a responsible Respondent official, with notice of the meeting
        for the reading of the Order to be announced in the same manner as the
        Respondent would customarily announce a meeting of employees and
        require all service and maintenance employees at this facility to attend the
        meetings and to obtain the prior approval of the Regional Director of the
        Fourth Region of the NLRB as to the time and date of the meeting or
        meetings for the reading of the Court's Order and the Regional Director's

approval of the content and method of announcement to employees of the

reading of the Court's Order;

(d) Within 20 days of the issuance of this Court's Order, to file with the District

Court with service upon the Petitioner, a sworn Affidavit from a responsible

official of the Respondent setting forth with specificity the manner in which the

Respondent has complied with the Court's Order, including the locations and

posting required by the Order.

(Id. at 7-8).

This Court, by Order dated June 25, 2019, directed the Respondent to show cause

why an injunction should not issue enjoining and restraining it from engaging in certain acts

and conduct in violation of the NLRA as described above pending final disposition of these

matters before the NLRB. (Doc. 9).

On July 1, 2019, the Court held a hearing on the Regional Director's Petition for

Injunction under Section 10(j) of the NLRA. At the hearing, the parties each presented

opening and closing statements. In addition, Petitioner called Luis Lopez, an organizer for

the Retail, Wholesale and Department Store Union, as a witness, and introduced several

exhibits into evidence.

The Petition having been fully briefed and a show cause hearing having been held,

the Petition is ripe for disposition. For the reasons that follow, the Regional Director's

Petition for Injunction under Section 10(j) of the NLRA (Doc. 1) will be granted as set forth in this memorandum opinion and the accompanying order.[1]

## II. FINDINGS OF FACT

1. Petitioner is the Regional Director of the Fourth Region of the National Labor Relations Board (the "Board"), an agency of the United States, and filed the Petition for and on behalf of the Board. (Doc. 11, at 2, ¶ 1; Doc. 14, at 9, ¶ 1).

2. Respondent is Mountain View Care and Rehabilitation Center, LLC, the operator of a licensed nursing facility located in Scranton, Lackawanna County, Pennsylvania, and the employer in the related case pending before the National Labor Relations Board. (Doc. 14, at 9, ¶ 3).

3. Jurisdiction of this Court is invoked pursuant to Section 10(j) of the NLRA. (Doc. 11, at 2, ¶ 2; Doc. 14, at 9, ¶ 2).

4. On May 1, 2019, Retail, Wholesale and Department Store Union (the "Union"), pursuant to the provisions of the NLRA, filed an amended charge with the Board in Case 04-CA-238216 alleging that Respondent, an employer within the meaning of Section 2(2) of the Act, has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (3) of the Act. (Doc. 11, at 2, ¶ 3; *see also*, Amended Charge Against Employer, Doc. 1, Ex. A).

---

[1] The parties agree that this Court has jurisdiction of the parties and of the subject matter of the proceeding, and under Section 10(j) of the NLRA is empowered to grant injunctive relief. (Doc. 11, at 6, ¶ 1; Doc. 14, at 12, ¶ 1).

5. On May 14, 2019, the Union, pursuant to the provisions of the NLRA, filed a second amended charge with the Board in Case 04-CA-235894 alleging that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (5) of the Act. (Second Amended Charge Against Employer, Doc. 1, Ex. B).

6. On May 16, 2019, based upon the charge in Case 04-CA-235894 and 04-CA-238216, the General Counsel of the Board, on behalf of the Board, by Petitioner, issued an "Order Consolidating Cases, Consolidated Complaint and Notice of Hearing" (the "Complaint"), pursuant to Section 10(b) of the NLRA, alleging *inter alia* that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (3) of the Act. (Doc. 11, at 2, ¶ 5; NLRB Order, Doc. 1, Ex. C).

7. Respondent does not contest that, under the standards of proof applicable in Section 10(j) proceedings, there is reasonable cause to believe that the allegations set forth in the Complaint before the Board are true. However, Respondent is contesting that matter on the merits before the Board and the Board has scheduled a hearing in that matter for July 8, 2019 before an Administrative Law Judge. (Doc. 14, at 10, ¶ 5; *see also*, Hr'g Tr., at 6, 23 (Respondent's counsel acknowledging that "under the minimal standards required under 10(j), we do concede that the Board has met their burden" with respect to the "reasonable cause" prong of the Section 10(j) analysis)).

8. Upon consideration of the evidence presented to the Court, including all exhibits filed of record and all testimony and exhibits produced at the hearing, and Respondent's agreement that there is reasonable cause to believe that the allegations set forth in the Complaint are true, the Court finds for the purposes of injunctive relief afforded under Section 10(j) that there is reasonable cause to believe that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (3) of the Act, affecting commerce within the meaning of Section 2(2), (6) and (7) of the Act. (Doc. 11, at 3-5, ¶ 6). Specifically,

   a. At all material times, Respondent, a Pennsylvania limited liability company, has provided rehabilitation services and nursing home care at a nursing home located in Scranton, Pennsylvania.

   b. During the past year, Respondent, in conducting its business operations described, received gross revenues in excess of $100,000 and purchased and received at the Nursing Home goods valued in excess of $5,000 directly from points outside the Commonwealth of Pennsylvania.

   c. At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6) and (7) of the NLRA and a health care institution within the meaning of Section 2(14) of the Act.

   d. At all material times, the Union has been a labor organization within the meaning of Section 2(5) of the NLRA.

e. At all material times, Donna Molinaro held the position of Administrator and Linda Yarros held the position of Human Resources Director. Both individuals are supervisors of Respondent within the meaning of Section 2(11) of the NLRA and are agents of Respondent within the meaning of Section 2(13) of the Act.

f. About March 4, 2019, Respondent, by Donna Molinaro and Linda Yarros, in Linda Yarros' office, interrogated employee Yolanda Ramos about her union activities and the union activities of other employees.

g. About March 4, 2019, Respondent suspended Yolanda Ramos.

h. About March 5, 2019, Respondent discharged Yolanda Ramos.

i. There is reasonable cause to believe that Respondent suspended and thereafter discharged Yolanda Ramos because she supported and assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities.

j. There is reasonable cause to believe that by the conduct described above, Respondent has been interfering with, restraining and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the NLRA.

k. There is reasonable cause to believe that by the conduct described above, Respondent has been discriminating in regard to the hire or tenure or terms or

conditions of employment of its employees, thereby discouraging membership

in a labor organization in violation of Section 8(a)(1) and (3) of the NLRA.

   I.   There is reasonable cause to believe that the unfair labor practices of

        Respondent described above affect commerce within the meaning of Section

        2(6) and (7) of the NLRA.

9.  The Union organized the Respondent's Certified Nurses Assistants ("CNA") in June,

    2018. (Hr'g Tr., Test. of Luis Lopez, at 40; Aff. of Luis Lopez, Doc. 4, Ex. A).

10. The Union and Respondent are currently involved in collective bargaining as to the

    full-time and regular part-time CNA-unit employees but have not reached a Collective

    Bargaining Agreement. (Doc. 14, at 12, ¶ 16; Hr'g Tr., at 31; Hr'g Tr., Test. of Luis

    Lopez, at 40-41). With respect to the negotiations, the parties have not reached an

    agreement on "the two biggest pies that we consider important": wages and medical.

    (Hr'g Tr., Test. of Luis Lopez, at 43). Approximately 5-10 negotiation sessions took

    place between October, 2018 and May, 2019. (Hr'g Tr., at 31; Hr'g Tr., Test. of Luis

    Lopez, at 41).

11. In May, 2019, the Union filed representation petitions for units on behalf of 36 per diem

    CNAs and 35-36 LPNs. An election is scheduled for the per diem CNA unit, but no

    election has been scheduled for the LPN unit. (Hr'g Tr., Test. of Luis Lopez, at 43-45).

12. On or about February 28, 2019, the Union, in an attempt to expand its unit at

    Respondent's facility, began recruiting employee leaders and collecting signatures for

a service and maintenance unit which consisted of the following: housekeeping, dietary, laundry aides, maintenance, and recreation/activities. (Hr'g Tr., Test. of Luis Lopez, at 45; Aff. of Luis Lopez, Doc. 4, Ex. A).

13. Yolanda Ramos was one of the first employees to act to organize the service and maintenance employees and secure employee signatures. (Doc. 14, at 10, ¶ 7; Aff. of Luis Lopez, Doc. 4, Ex. A). Yolanda Ramos was the only non-CNA to collect signatures for the petition. (Hr'g Tr., Test. of Luis Lopez, at 46).

14. Prior to the discharge of Yolanda Ramos, the Union had collected 13 signatures on the petition to organize between February 27, 2019 and March 1, 2019. (Union Petitions, Doc. 4, Ex. D; Hr'g Tr., Test. of Luis Lopez, at 46). Since the discharge of Yolanda Ramos on March 5, 2019, to the date of the hearing before this Court, the Union has collected 6 additional signatures. (Hr'g Tr., Test. of Luis Lopez, at 46-47, 65; Petitioner's Hr'g Ex. 2(b) at 4 (offered as "an addition to [Doc. 4] Ex. D")). None of the additional signatures are from dietary aides. (Hr'g Tr., Test. of Luis Lopez, at 47, 65; *see also*, Hr'g Tr. at 9, 14).

15. Following the discharge of Yolanda Ramos, there are no non-CNAs collecting signatures for the employees. (Hr'g Tr., Test. of Luis Lopez, at 47).

16. Following the discharge of Yolanda Ramos on March 5, several employees have declined to sign the Union petition or aid in the Union organizing of service and maintenance workers and have expressed fear and/or apprehension about losing

their employment or "getting in trouble" should they support the Union organizing efforts. (Aff. of Confidential Witness I, Doc. 4, Ex. B (CNA stating that on April 5, a kitchen employee "said that what the Employer had done to . . . Ramos was very unfair and that everyone was upset about it" but refusing to sign petition because he/she "did not want to be the only one signing and exposing [him/her] to getting in trouble."); (Aff. of Confidential Witness II, Doc. 4, Ex. C (CNA stating that: (1) a dietary aide "told me that [he/she] would support the Union but did not want to get in trouble" and that the aide said that "we had to be very careful because there were people out there who would tell on you if you spoke about the Union"; (2) on a different occasion, a housekeeping/laundry employee who had previously signed the petition "asked whether [she] could get in trouble for signing the petition"; and (3) a dietary aide told the CNA that she "did not know if she would sign the petition, given everything that happened with Ramos."); Aff. of Luis Lopez, Doc. 4, Ex. A (stating that a housekeeper who attended a Union meeting in mid-March told him that "everyone was too scared to sign because of what happened to Ramos" and that a dietary aide who attended a different meeting "said that no one wanted to sign the petition and were scared of being terminated like Ramos" and that he/she said that he/she "could not afford to get terminated."); *see also*, Hr'g Tr., Test. of Luis Lopez, at 47-50).

17. As of June, 2019, all of the dietary operations at Respondent's facility have been subcontracted out to a third-party, Sodexo, and therefore all of the dietary aide workers are no longer employed by Respondent. (Hr'g Tr., at 19).

18. As a result of the subcontracting of all dietary operations to Sodexo, Respondent asserts that it does not have the ability to return Yolanda Ramos to the position of a dietary aide. However, Respondent acknowledges that it can return Yolanda Ramos to a housekeeping position at the same salary as she was receiving at the time of her termination. (Hr'g Tr., at 19, 28-29, 73).

19. Due to the time it takes to receive a decision from an Administrative Law Judge, and the subsequent proceedings and appeals thereafter should the Petitioner prevail and the Respondent not wish to comply, it may take "years" before a Final Order is issued which may be enforced against the Respondent. (See Hr'g Tr., at 17-18; 27). This timetable for the ultimate resolution of the underlying action significantly hinders the Union's efforts to organize and increases the likelihood that the interest in, and energy of, a union drive will dissipate over the 2-3 years that it may take to fully resolve this action. Absent injunctive relief under Section 10(j), this timetable allows the Respondent to accomplish any unlawful objectives to prevent Union organization and formation before a Final Order may be issued, specifically those which are the subject of the Petitioner's Complaint which will be heard by an ALJ of the NLRB on July 8, 2019.

20. In 2018, the NLRB issued 1088 complaints and received 22 authorizations for the filing of a petition for an injunction pursuant to Section 10(j) of the NLRA. (Petitioner's Hr'g Ex. 2(a)).

21. Based on the evidence presented, it may be fairly anticipated that, unless restrained, Respondent will continue its aforesaid unlawful acts and conduct in violation of Section 8(a)(1) and (3) of the NLRA.

22. Based on the evidence presented, unless the continuation or repetition of the above described unfair labor practices is restrained, a serious failure of enforcement of important provisions of the NLRA, and of the public policy embodied in the Act, will result before an ultimate order of the Board can issue.

### III. STANDARD FOR ISSUANCE OF INJUNCTION UNDER SECTION 10(J) OF THE NLRA

"In determining whether interim relief is appropriate under § 10(j), a district court must evaluate whether there is 'reasonable cause' to believe that an unfair labor practice has occurred and whether an injunction would be 'just and proper.'" *Pascarell ex rel. N.L.R.B. and Int'l Ladies Garment Workers Union v. Vibra Screw Inc.,* 904 F.2d 874, 877 (3d Cir. 1990).

In *Vibra Screw,* the Third Circuit reversed the District Court and remanded the case with the direction to enter an order granting an injunction pursuant to Section 10(j). In so doing, it noted that "this case involves a situation in which the union had recently been certified, management had demonstrated anti-union bias, and, most importantly,

13

management had fired the few employees who had been the most open in their support for

the union." *Id.* at 881. The Court, in language that has application to the present case,

stated:

> The message this management action sent was clear—if one is associated with the union, one will be disciplined. Not only is that precisely the kind of message, and action, that the NLRA prohibits, it is the kind of message that cannot be effectively retracted even if the discharged employees are ultimately reinstated by the Board. Employees will not risk the uncertainty and hardship attendant upon even temporary lay-off if that is the price they must pay for union activity.

*Id.*

The Circuit in *Vibra Screw* also made clear what is necessary for the issuance of

Section 10(j) injunctive relief:

> In order to obtain a § 10(j) injunction, the Board must also establish that it had reasonable cause to believe that the NLRA was violated. Although the ultimate question to be decided is whether the employer intended to thwart the bargaining process, we held in *Wellington Hall*, that "[i]n a section 10(j) or 10(l) case the court need not, indeed should not, make a finding of employer motivation. It need only find a reasonable cause for belief that there was such a motivation." [*Eisenberg ex rel. N.L.R.B. v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906 (3d Cir. 1981)]. This holding has been refined into a two pronged standard. First, there must be a substantial, non-frivolous, legal theory, implicit or explicit, in the Board's argument, and second, taking the facts favorably to the Board, there must be sufficient evidence to support that theory.

*Id.* at 882.

The Third Circuit re-affirmed this standard in *Chester ex rel. N.L.R.B. v. Grane*

*Healthcare Co.*:

> As an initial matter, it bears explaining that the "reasonable cause" analysis is not the deferential rubber stamp that the District Court and Grane characterize it to be. To establish reasonable cause in the Third Circuit, "there must be a

substantial, non-frivolous, legal theory, implicit or explicit, in the Board's argument, and second, taking the facts favorably to the Board, there must be sufficient evidence to support that theory." *Vibra Screw*, 904 F.2d at 882. Significantly, the circuits that apply the four-part test use a substantially similar standard.

666 F.3d 87, 98 (3d Cir. 2011). Further, in a Section 10(j) proceeding "[t]he district court

must find that the issuance of an injunction is 'just and proper,' i.e. that it is in the public

interest to grant the injunction, so as to effectuate the policies of the National Labor

Relations Act or to fulfill the remedial function of the Board." *Id.* at 98-99 (quoting *Eisenberg*

*ex rel. N.L.R.B. v. Lenape Products, Inc.*, 781 F.2d 999, 1003 (3d Cir. 1986)).

In *Wellington Hall*, the Court of Appeals reversed the District Court, finding an abuse

of discretion in its refusal to order reinstatement of discharged employees pending a hearing

before the Board, explaining:

> The court also noted that there was no need for a reinstatement order because the Board, if it found that the discharges were in retaliation for engaging in protected activity, could order reinstatement with back pay. That reasoning, however, misapprehends the purpose of section 10(j) relief. When the Board files an application for such relief it is not acting on behalf of individual employees, but in the public interest. . . . That interest is in the integrity of the collective bargaining process. If union supporters are excluded from the bargaining process pending resolution of unfair labor practice charges, the position of the designated bargaining representative will in all likelihood be substantially undermined. All members of the bargaining unit may be affected by such an erosion of union support. Furthermore, the discharge of "active and open union supporters. . .risk(s) a serious adverse impact on employee interest in unionization." *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir. 1980). When the Board, faced with an employer's resort to tactics calculated to undermine union support at a critical stage of the bargaining process, seeks section 10(j) relief, the focus of attention should not be on what relief may ultimately be granted to individual employees, but on the likelihood of harm to the bargaining process in the interim.

15

*Eisenberg ex rel. N.L.R.B. v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906-907

(3d Cir. 1981).

These principles were repeated in *Hirsch ex rel. N.L.R.B. v. Dorsey Trailers, Inc.*:

> The standard to be applied by a district court in determining whether granting temporary relief pursuant to § 10(j) is just and proper should be informed by the policies underlying § 10(j). *See Lenape Products*, 781 F.2d at 1003; *Suburban Lines*, 731 F.2d at 1090-91. "Congress sought to ensure that the Board would be able to exercise effectively its ultimate remedial power." *Lenape Products*, 781 F.2d at 1003. Section 10(j) "was designed to enable the Labor Board to vindicate its ultimate remedial power by affording limited interim relief in instances where the passage of time reasonably necessary to adjudicate the case on its merits convinced both the Board and the federal courts that the failure to grant such relief might dissipate the effective exercise of such power." *Suburban Lines*, 731 F.2d at 1091. Thus, the focus in a § 10(j) determination is on the public interest, *Vibra Screw*, 904 F.2d at 876, and "the *unusual* likelihood . . . of ultimate remedial failure" by the NLRB. *Suburban Lines*, 731 F.2d at 1091 n.26 (emphasis in original). "The public interest at stake is the promotion of wholesome and mutually acceptable labor relations and the settlement of labor disputes through collective bargaining between employees and their employer." *Vibra Screw*, 904 F.2d at 876 (citation and quotation marks omitted).
>
> In evaluating whether to issue an injunction under the "just and proper" prong, a district court "should discuss and determine whether the failure to grant interim injunctive relief would be likely to prevent the Board, acting with reasonable expedition, from effectively exercising its ultimate remedial powers." *Suburban Lines*, 731 F.2d at 1091-92. "[T]he critical determination is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired." *Vibra Screw*, 904 F.2d at 879. This requires an assessment of "the likelihood of harm to the bargaining process" absent an injunction. *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 907 (3d Cir.1981). "Unless there are circumstances, like the size, intimacy and longevity of the bargaining unit, which indicate that the bargaining process will not be harmed, courts must be deferential to the Board's determination that the integrity of the process needs interim protection." *Vibra Screw*, 904 F.2d at 879 n.7. The § 10(j) analysis must be guided by the

16

particular facts in each case. *See Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138, 142 (3d Cir.1975).

147 F.3d 243, 247-248 (3d Cir. 1998).

The need for Section 10(j) injunctive relief was underscored by the First Circuit in

*Pye ex rel. N.L.R.B. v. Excel Case Ready.* There, the Court, citing the Third Circuit's

decision in *Wellington Hall,* stated that:

> This Court has indicated that the "discharge of active and open union supporters . . . risks a serious adverse impact on employee interest in unionization" and can create irreparable harm to the collective bargaining process. *Pan Am. Grain Co.*, 805 F.2d at 27 (quoting *Eisenberg v. Wellington Hall Nursing Home, Inc.,* 651 F.2d 902, 906-07 (3d Cir.1981) (internal quotation omitted)). The absence of key union organizers can contribute to the erosion of support for a nascent union movement. *Centro Medico,* 900 F.2d at 454. Moreover, the fear of employer retaliation after the firing of union supporters is exactly the "irreparable harm" contemplated by § 10(j). *Id.; see also NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1572 (7th Cir. 1996) (noting the "chilling effect" on organization that often follows the illegal discharge of key union members).
>
> The district court also noted that "a long time may pass before the Board decides the merits of this case, [during which period] the spark to unionize the Taunton plant may be completely extinguished." *Excel,* District Court Order at 11. Section 10(j) interim relief is designed to prevent employers from using unfair labor practices in the short run to permanently destroy employee interest in collective bargaining. To allow such interference with a unionization effort would make the Board's remedial process ineffective simply because it is not immediate. *See, e.g., Electro-Voice,* 83 F.3d at 1573-74. Because the disappearance of the "spark to unionize" may be an irreparable injury for the purposes of § 10(j), the district court does not abuse its discretion when evidence shows that the discharge of union supporters has delayed or halted the unionization effort. *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988); *Universidad Interamericana de P.R.*, 722 F.2d at 958-60.
>
> Lastly, the district court feared that "the improperly discharged employees are likely to accept other jobs and find it difficult, if not impossible, to accept

reinstatement with Excel." *Excel*, District Court Order at 11. Although § 10(j) relief is not designed to address harm to particular employees, *Wellington Hall*, 651 F.2d at 906-07, the fact that the original union organizers will likely never return to work if interim relief is not granted may itself cause irreparable injury to the unionization effort, as the district court correctly pointed out.

238 F.3d 69, 74-75 (1st Cir. 2001). *See also, N.L.R.B. v. Juniata Packing Co.*, 464 F.2d 153, 156 (3d Cir. 1972) ("One recent employee had been discharged for signing a card in favor of unionization. Certainly such conduct is likely to intimidate employees who otherwise would be disposed to support unionization.").

## IV. UNDERLYING UNFAIR LABOR PRACTICES – APPLICABLE LAW

Here, the NLRB has alleged that the employer, Mountain View Care and Rehabilitation Center, LLC, unlawfully interrogated an employee, Yolanda Ramos, with respect to her union activity on March 4, 2019, and thereafter suspended that employee and fired her on March 5, 2019.

With respect to interrogation "an employer violates § 8(a)(1) of the NLRA 'by interrogating employees about their union sympathies, when doing so suggests to the employees that the employer may retaliate because of those sympathies.'" *1621 Route 22 W. Operating Co., LLC v. N.L.R.B.*, 825 F.3d 128, 145 (3d Cir. 2016) (quoting *Hedstrom Co. v. N.L.R.B.*, 629 F.2d 305, 314 (3d Cir. 1980)). Furthermore, "Section 8(a)(3) of the NLRA prohibits an employer from taking adverse employment actions against an employee in retaliation for union membership or activities." *Id.*

Under the *Wright Line* test, approved by the Supreme Court in *N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393, 402 (1983), *abrogated by Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994), "the employee must [first] establish that the protected conduct was a 'substantial' or 'motivating' factor [for the employer's action]. Once this is accomplished, the burden shifts to the employer to demonstrate that it would have reached the same decision absent the protected conduct." *Wright Line*, 251 N.L.R.B. 1083, 1087 (1980).[2]

The Third Circuit has also recognized that where the employer's motive for questioning the employee was entirely unlawful, that interrogation is itself a violation of the NLRA and the employee's alleged dishonesty is therefore immaterial for purposes of determining the lawfulness of the discharge. *MCPC Inc. v. N.L.R.B.*, 813 F.3d 475 n.11 (3d Cir. 2016).

## V. ANALYSIS

Respondent having conceded that under the standards of proof applicable in Section 10(j) proceedings, there is reasonable cause to believe that the allegations set forth in the

---

[2] Although *Greenwich Collieries* abrogated *Transportation Management Corporation*, the *Wright Line* test remains the governing law on the point. *See 1621 Route 22 W. Operating Co.*, 825 F.3d at 145-146 & n. 12 (applying the *Wright Line* test and explaining that "[a]lthough the [Supreme] Court later abrogated a portion of *Transportation Management* on grounds not relevant here, the central holding 'remains intact. The NLRB's approach in *Transportation Management* is consistent with § 7(c) [of the NLRA] because the NLRB first required the employee to persuade it that antiunion sentiment contributed to the employer's decision.' *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 278, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994).").

Complaint before the Board are true (*see* Doc. 14, at 10, ¶ 5), the only issue before this Court is whether an injunction would be "just and proper".

In light of the foregoing law and factual findings, the Court has made the following determinations.[3]

Preliminarily, the Court has determined that the legal theory advanced by the Regional Director is substantial and not frivolous and there is sufficient evidence to support the non-frivolous theory advanced by the Regional Director.

Here, there is reasonable cause to believe that the Respondent engaged in the interrogation and discharge of Yolanda Ramos because of her engagement in lawful union activities. An injunction in this action is "just and proper" on the basis that that the interrogation and discharge of Ramos has had a chilling effect on the organizing efforts of the Union and has intimidated and restrained other employees from exercising their right to form, join, or assist a labor organization and to engage in collective bargaining through representatives of their own choosing.

As previously stated, Respondent has admitted that there is reasonable cause to believe that the allegations set forth in the Regional Director's Complaint are true and that

---

[3] The Court notes that it is not making any final determination concerning the merits of the unfair labor practice charges in this case. The Court further notes that Respondent concedes that "reasonable cause" exists to satisfy the first prong of the test for the issuance of Section 10(j) injunctive relief. For the reasons set forth herein, the Court finds that the second prong of the standard, that the issuance of injunctive relief is "just and proper", has been met. In so finding, the Court has not resolved disputed issues of fact or the credibility of witnesses to the extent that this function is reserved exclusively for the Board in the underlying administrative proceeding.

the Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (3) of the NLRA. (Doc. 14, at 10, ¶ 5; Doc. 14-1, at 16; *see also*, Hr'g Tr., at 6, 23). The Respondent, however, contests whether the issuance of an injunction is "just and proper." In support of the proposition that no such injunction is necessary, the Respondent advances the following arguments:

(1) There has been no "chilling effect" on union organizing activity at the nursing home because there are currently collective bargaining negotiations going on for the first bargaining unit organized by the union involved there, i.e., the CNAs.

(2) The Union has successfully brought forward another unit for Board certification, specifically the LPNs, which is currently "under consideration and dispute" before the Board;

(3) The Union has brought a petition for Board certification for another unit, the per diem CNAs (PRN-CNAs), where an election is scheduled; and

(4) The Union is involved in litigating two unfair labor practice charges before the Board, including the one before this Court.

(Doc. 14-1, at 19). Thus, the Respondent claims that the termination of the employee in this case, Yolanda Ramos, has not chilled any other organizing activities by the Union. (*Id.*; *see generally*, Hr'g Tr.). Respondent's arguments are each without merit.

First, the current status of the Union's efforts on behalf of the CNAs and LPNs is irrelevant to the analysis of whether injunctive relief is just and proper in this case due to

alleged unfair labor practices with respect to the union's attempt at organizing the service and maintenance employees. The CNA, LPN, and per diem CNA, units are separate bargaining units which have no connection to the interests of the service and maintenance employees who are the persons whose right to organize is affected by the Respondent's alleged unfair labor practice. The chilling effect of the firing of Yolanda Ramos can only be evaluated in terms of the service and maintenance employees because it is their organizational rights under Section 7 of the NLRA that have been affected.

Respondent's efforts to negate the chilling effect of its conduct at issue in this case by making reference to the existence of collective bargaining negotiations for the CNAs proves nothing because, while 5-10 negotiation sessions have taken place, no Collective Bargaining Agreement has been reached, including any agreement as to key issues such as medical benefits or wages, and nothing in the record suggests that a Collective Bargaining Agreement is imminent or that one will be reached during the Union's certification year.

With respect to the employees other than the service and maintenance employees, who are included in the LPNs and per diem CNAs proposed units, again, nothing in the record demonstrates that these inchoate proceedings have any connection to the group of employees of which Yolanda Ramos is a member, and further provide no evidence which would tend to mitigate the chilling effect of her discharge on those employees. Respondent would have this Court accept the proposition that the chilling effect of Yolanda Ramos'

discharge on the employees in the putative bargaining unit sought by the Union is dissipated merely by its participation as a Respondent in other administrative proceedings before the Board relating to other groups of employees who share no community of interest with the service and maintenance employees. The Court finds no merit in this argument.

The Court further finds that an injunction is necessary to preserve the Board's ultimate remedial power by restoring the status quo until the Board can actually hold its hearing and make its decision first through its Administrative Law Judge and then, if necessary, by appeal to the NLRB itself. During the hearing, the parties agreed that, due to the time it takes to receive a decision from an Administrative Law Judge and to resolve any appeals from the ALJ's decision, as well as the length of time it will take for a Petition for Review to be filed and ruled upon by the United States Court of Appeals for the Third Circuit, it may take "years" before a Final Order is issued which may be enforced against the Respondent should the Petitioner prevail. (*See* Hr'g Tr., at 17-18; 27). This timetable for the ultimate resolution of the underlying action significantly hinders the Union's efforts to organize and increases the likelihood that the interest in, and energy of, a union drive will dissipate over the time that it may take to fully resolve this action. Absent injunctive relief under Section 10(j), Respondent may accomplish any unlawful objectives to prevent Union organization and formation before a Final Order is issued and specifically those which are the subject of the Petitioner's Complaint which will be heard by an ALJ of the NLRB. Therefore, because of the length of this process, injunctive relief is necessary.

In light of the afore-listed findings of fact and the applicable law, an injunction is just

and proper in the present action as the discharge of a union adherent or a union leader

such as Yolanda Ramos, an individual participating in the campaign to unionize the service

and maintenance employees, has a chilling effect on the union organizing drive. The

affidavits and testimony of record demonstrate that the service and maintenance employees

are only willing to take limited, if any, risk, and fear that by associating themselves with the

union organizing or being perceived as being associated with the union, they risk discharge.

This creates a chilling effect on these employees' willingness to exercise their Section 7

rights "to form, join, or assist labor organizations, to bargain collectively through

representatives of their own choosing, and to engage in other concerted activities for the

purpose of collective bargaining or other mutual aid or protection."

## VI. CONCLUSION

For the foregoing reasons, the Court finds that Petitioner has met its burden with

respect to its entitlement to injunctive relief pursuant to Section 10(j) of the NLRA pending

the final disposition of the matters involved and pending before the NLRB. The Regional

Director of the Fourth Region of the National Labor Relations Board's Petition for Injunction

under Section 10(j) of the National Labor Relations Act, as Amended (Doc. 1) will therefore

be granted as set forth in this memorandum opinion and accompanying Order.

Robert D. Mariani
United States District Judge